845 F.2d 624
 46 Fair Empl.Prac.Cas. 1776,
46 Empl. Prac. Dec. P 37,942
In re Inez Jeanette LEWIS.
Inez Jeanette LEWIS, Plaintiff-Appellant, Cross-Appellee,
v.
SEARS, ROEBUCK & COMPANY, Defendant-Appellee, Cross-Appellant.
 Nos. 86-1473, 86-1498, 86-1612, and 86-1613.
 United States Court of Appeals,
Sixth Circuit.
 Argued Dec. 3, 1987.
Decided April 27, 1988.
Rehearing and Rehearing En Banc Denied June 29, 1988.
 
 George B. Washington (argued), Greenspon, Scheff & Washington, Detroit, Mich., for plaintiff-appellant, cross-appellee.
 Charles C. DeWitt, Dykema, Gossett, Spencer, Goodnow & Trigg, Detroit, Mich., William B. Balke (argued), for defendant-appellee, cross-appellant.
 Before KEITH, MILBURN and NELSON, Circuit Judges.
 KEITH, Circuit Judge.
 
 
 1
 Plaintiff Jeanette Lewis brought suit against Sears, Roebuck & Company on the grounds that Sears had racially discriminated against her in violation of Michigan's Elliott-Larsen Act, Mich.Comp.Laws Ann. Sec. 37.2202(1)(a) (West 1985), and Title VII of the Civil Rights Act of 1964, 42 U.S.C. Sec. 2000e et seq. On November 25, 1985, Lewis prevailed at a jury trial on the Elliott-Larsen Act claim. The jury awarded her $30,597 in lost wages. In response to the jury verdict, Defendant Sears filed motions for judgment notwithstanding the verdict, new trial and remittitur, which were denied by the district court. On December 19, 1985, the court made separate findings of fact as to Lewis' Title VII claim[1]--the judge disagreed with the jury and found no discrimination. On January 30, 1986, the court denied Lewis' motion to be reinstated to her former position at Sears, concluding that discrimination had not been conclusively shown. Lewis' motion for reconsideration on the denial of equitable relief was denied; she then filed a timely appeal from the order denying reinstatement. Sears filed a cross-appeal from the jury verdict itself.
 
 
 2
 After the filing of the appeals, the district court decided that plaintiff's attorney's fee award should be reduced by one-half. Plaintiff also filed a timely appeal from that determination, with Sears filing a cross-appeal as to the award of attorney's fees at all.
 
 
 3
 For the reasons set forth below, we AFFIRM in part and REVERSE in part, ordering reinstatement and full attorney's fees. Further, we REMAND the case back to the district court for additional consideration of counsel fees for work done pursuing this appeal.
 
 I.
 FACTS
 
 4
 Jeanette Lewis is a black woman. For twenty-three years she worked at Sears' Troy, Michigan store, the third largest Sears store in the United States. At the time of her termination, Lewis sold "big ticket" (i.e., high-priced) items. As a general rule, the big-ticket sales positions are highly coveted by employees because of the earnings potential in those departments.
 
 
 5
 Lewis began working at the Troy Sears store in 1963, even before the store opened. She was employed in various departments over the years, and garnered satisfactory work records in those areas. In 1976, Lewis' supervisor prodded Lewis into applying for a sales position in appliances, a big-ticket department. Lewis sought the position, and was soon promoted to that division.
 
 
 6
 Of the approximately ninety full-time big-ticket salespersons at the store during the relevant time period, there were no black men and four black women. The Troy store manager at the time of the events, Mr. Eugene White, was also black. Lewis' immediate supervisor was Tom Draper, a white male, who in turn was under the supervision of Steve Machovec, another white male.
 
 
 7
 The basis for Lewis' complaint is that, while she admittedly fell short of Sears' articulated sales goals for big-ticket items, unlike her similarly-situated white co-workers, she was not given the opportunity to transfer to another department. Instead, Lewis was terminated. In particular, at trial, evidence was presented that certain white big-ticket salespersons with sales deficiencies were transferred to different departments in the store instead of initially being faced with termination.
 
 
 8
 In August, September, October and December 1983, and on February 16, 1984, Lewis was given deficiency interviews for her poor sales performance. She was fired on February 29, 1984. Plaintiff's evidence disclosed that the following white employees also experienced sales performance problems or were given deficiency interviews, but were transferred instead of fired: 1) Earl Lock received eleven write-ups for poor sales and poor attendance, and was transferred from the refrigerator department to men's suits; 2) Daniel Kleczkowski received a deficiency interview for selling less than half of anyone else in his home-improvement division, and was transferred to vacuum cleaners, where he failed to carry sales as well--only then was he terminated; 3) Margaret Rock's ill health was responsible for her poor sales record, and she was transferred from home appliances to cameras; 4) Vaclav Kalivoda received a deficiency interview because he was far below goals in maintenance agreement performance (not sales), and was transferred to the garage; 5) Joanne Phillip was always last in the vacuum department in monthly sales, and was transferred to sporting goods; 6) Terry Sylvain was last in the appliances department for six of the first eight months of 1984, and was transferred to the jewelry department.
 
 
 9
 Sears introduced evidence that some of those transfers were for reasons other than poor sales (i.e., seniority, illness, or help with Christmas sales), and plaintiff countered with evidence suggesting that the transfers were indeed related to sub-par sales performance. Witnesses for Sears also testified that the policy with respect to departmental transfers of poorly-performing salespersons changed in 1983: the alleged new policy permitted termination instead of transferral. Plaintiff impeached this testimony at trial, and offered her own evidence attacking the existence of such a policy, showing that the alleged change was never put in writing and, if it existed, was inconsistently applied in practice. Sears also presented evidence that Douglas Kern, a white male in the home improvements division, was terminated for unsatisfactory performance, not transferred. Plaintiff attempted to distinguish Kern by evidence that 1) his sales per hour were less than half the division average (Lewis' sales per hour for all of 1983 were just over seventy-six percent of the average in her division); 2) he failed to sell a single maintenance agreement in one month; and 3) he apparently "just gave up."
 
 
 10
 The jury evidently believed plaintiff's proofs, for after four and one-half hours of deliberations, it answered "yes" to the following special verdict question: "Did Sears discriminate against plaintiff because of her race in discharging her from her employment?" Plaintiff then moved for the equitable remedy of reinstatement and restoration of benefits, which the court denied.
 
 
 11
 After the jury's verdict, the plaintiff moved for an award of attorney's fees and costs under Sec. 37.2802 of the Elliott-Larsen Act. The district court referred this motion to a magistrate for recommendation. Both parties filed objections to the magistrate's report. While finding that the proper fee award here was $34,200, the district court ultimately cut that figure in half, awarding $17,100 in actual attorney's fees and $1,490.31 in costs. The court stated that it was decreasing the award "by one-half to account for the results achieved and the amounts in question ($30,597 in back pay and benefits awarded to plaintiff)," presumably referring to the plaintiff's inability to garner full relief--reinstatement--from the court.
 
 
 12
 Plaintiff appeals on two grounds: first, that the district court on the equitable motion for reinstatement was bound by the jury's finding of discrimination, and should have therefore ordered reinstatement; and second, that the district court improperly cut the award for attorney's fees in half. Boiled down, defendant's cross-appeal consists generally of four issues: that there was insufficient evidence to support the jury's verdict; that the district court erred in several of its instructions to the jury; that the district court abused its discretion in denying defendant's motion for remittitur; and that the district court erred in awarding attorney's fees at all.
 
 
 13
 We find that the district court erred in not granting the equitable relief consistent with the jury's verdict, and order that plaintiff be reinstated to the first available sales position in the Troy Sears store. Further, we believe that the district court erred in cutting the attorney's fees award in half. We therefore REVERSE the district court's order denying reinstatement, and order that the attorney's fee award be granted in full. We REMAND the case to the district court to consider the fee award in light of plaintiff's counsel's work on this appeal. We AFFIRM the district court on the separate cross-appeal issues.
 
 II.
 DISCUSSION
 A. Reinstatement
 
 14
 The jury found that Lewis was a victim of race discrimination under Michigan's Elliott-Larsen Act. Thus, the question that is before us is whether the district court was bound by the jury's factual finding of discrimination when deciding Lewis' equitable claim for reinstatement.
 
 
 15
 The district court in this case applied Michigan law when it determined that a Michigan court sitting in equity is not bound by the findings of the jury. Citing Smith v. University of Detroit, 145 Mich.App. 468, 378 N.W.2d 511 (1985), and Abner A. Wolf, Inc. v. Walch, 385 Mich. 253, 188 N.W.2d 544 (1971), the district court held: "So, then, the Court finds that under Michigan law the findings of the jury [are] not binding on the judge in determining whether or not to award reinstatement." Joint Appendix ("J.A.") at 701-704. The court went on to make its own separate findings of fact under the Title VII claim, which were at odds with the jury's verdict and implied findings on the Elliot-Larsen Act claim. In the alternative, the court held that even if it was bound by the jury verdict, it would deny equitable relief because race was but one factor in the decision to terminate Lewis:
 
 
 16
 [T]he Court believes it was within the Court's own area of discretion under Michigan law to deny reinstatement on the grounds that race determination was only one factor in defendant's decision to discharge and the evidence presented with regard to her quality of work was sufficient in itself to justify discharge.
 
 
 17
 (J.A. at 706).
 
 
 18
 In its decision to deny reinstatement, the district court was therefore confronted with a choice between state law, as articulated in Smith and Abner Wolf, and federal precedent, which, as we shall see below, holds that a judge sitting in equity is bound by the factual findings of the jury on an accompanying legal claim. The district court chose to apply state law. We believe that the court was in error.
 
 
 19
 As plaintiff argues, and as the Supreme Court has often held in diversity and pendent jurisdiction cases: while the substantive dimension of a claim finds its source in state law, Erie R. Co. v. Tompkins, 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188 (1938), the allocation of functions between judge and jury must be made by recourse to federal law. See Simler v. Conner, 372 U.S. 221, 222, 83 S.Ct. 609, 610, 9 L.Ed.2d 691 (1963); Magenau v. Aetna Freight Lines, 360 U.S. 273, 278, 79 S.Ct. 1184, 1188, 3 L.Ed.2d 1224 (1959) (" 'An essential characteristic of [the federal system] is the manner in which, in civil common-law actions, it distributes trial functions between judge and jury ...' ") (quoting Byrd v. Blue Ridge Rural Electric Co-op, Inc., 356 U.S. 525, 78 S.Ct. 893, 2 L.Ed.2d 953 (1958)). This is especially true in non-diversity cases, where there are indications of federal law leaning toward uniformity and there is no significant state interest to be served by the absorption of the state law as the rule of decision. We find in Abner Wolf and Smith no indication of a compelling state policy which favors the practice of having judges who decide equitable claims ignore jury verdicts. The Supreme Court cases and their progeny, on the other hand, underscore the important federal policy favoring federal determination of the allocation of functions between jury and judge. See also Dairy Queen, Inc. v. Wood, 369 U.S. 469, 82 S.Ct. 894, 8 L.Ed.2d 44 (1962); Beacon Theatres, Inc. v. Westover, 359 U.S. 500, 79 S.Ct. 948, 3 L.Ed.2d 988 (1959),[2] and the line of cases resulting therefrom. We therefore find that the district court erred in not applying the federal law, set forth below, which holds that a judge deciding an equitable issue is bound by the jury's factual findings on an adjoining legal claim.
 
 
 20
 While an action for reinstatement and backpay under Title VII is by nature equitable and entails no rights under the seventh amendment, an action for damages under the Elliott-Larsen Act is by nature legal and must be tried by a jury on demand. And "[w]hen legal and equitable actions are tried together, the right to a jury trial in the legal action encompasses the issues common to both." Lincoln v. Board of Regents of University System, 697 F.2d 928, 934 (11th Cir.), reh'g denied, 705 F.2d 471, cert. denied, 464 U.S. 826, 104 S.Ct. 97, 78 L.Ed.2d 102 (1983) (citing Curtis v. Loether, 415 U.S. 189, 196 n. 11, 94 S.Ct. 1005, 1009 n. 11, 39 L.Ed.2d 260 (1974); Dairy Queen, Inc. v. Wood, 369 U.S. 469, 470-73, 82 S.Ct. 894, 896-97, 8 L.Ed.2d 44 (1962)). Thus, "when a party has a right to a jury trial on an issue involved in a legal claim, the judge is of course bound by the jury's determination of that issue as it affects his disposition of an accompanying equitable claim." Lincoln, 697 F.2d at 934. According to the progeny of Beacon Theatres, Inc. v. Westover, 359 U.S. 500, 79 S.Ct. 948, 3 L.Ed.2d 988 (1959), the legal claim (here, the Elliott-Larsen Act claim) must be tried first before a jury and the equitable claim resolved subsequently in light of the jury's determination of the legal claim. Hildebrand v. Bd. of Trustees of Michigan State University, 607 F.2d 705, 713 (6th Cir.) (Weick, J., concurring), later app., 607 F.2d 1282 (1979), and 662 F.2d 439, cert. denied, 456 U.S. 910, 102 S.Ct. 1760, 72 L.Ed.2d 168 (1982). As stated by the Eleventh Circuit in Lindsey v. American Cast Iron Pipe Co., 810 F.2d 1094 (11th Cir.1987), "[i]t is well-settled that the 'court may not make findings' contrary to or inconsistent with the jury's resolution ... of that same issue as implicitly reflected in its general verdict." Id. at 1098 (quoting Craft v. Board of Trustees of Univ. of Illinois, 793 F.2d 140, 143 (7th Cir.), cert. denied, --- U.S. ----, 107 S.Ct. 110, 93 L.Ed.2d 59 (1986)).
 
 
 21
 One important reason that a judge is not to make findings that contravene a jury's verdict is that the verdict is res judicata with respect to the factual issues which would have necessitated jury resolution. In a recent case very similar to the one now before us, this court held that in situations where it appears that the court sitting in equity and the jury have reached different results, "the principles of collateral estoppel control: '[w]hen a party has a right to a jury trial on an issue involved in a legal claim, the judge is ... bound by the jury's determination of that issue as it affects his disposition of an accompanying equitable claim.' " Kitchen v. Chippewa Valley Schools, 825 F.2d 1004, 1014 (6th Cir.1987) (quoting Lincoln, 697 F.2d at 934). See also Garza v. City of Omaha, 814 F.2d 553, 557 (8th Cir.1987); King v. Alco Controls Div. of Emerson Electric Co., 746 F.2d 1331, 1332 n. 2 (8th Cir.1984).
 
 
 22
 Here, as in Chippewa, the district court inconsistently resolved the equitable and legal claims arising under Title VII and the Elliott-Larsen Act. Here, as in Chippewa, two factfinders examining the same facts under the same standard of liability reached opposite conclusions as to whether the defendant was liable. Thus, here, as in Chippewa, we hold that the jury's verdict and factfinding controls. The judge erred as a matter of law by making factual findings inapposite to those already necessarily determined by the jury.
 
 
 23
 In the context of employment discrimination cases, it is well-settled that a jury's findings of discrimination are binding on a court considering reinstatement. See Williams v. City of Valdosta, 689 F.2d 964, 976 (11th Cir.1982), where the court held that, "[a]ll findings necessarily made by the jury in awarding the verdict to [the plaintiff] are binding on the parties as well as on the trial court." Similarly, the Eighth Circuit in an age discrimination case found that the jury verdict is binding on the court for the purpose of determining reinstatement: " 'In the absence of exceptional circumstances, the jury verdict in favor of the plaintiff on the issue of age discrimination is res judicata for the purposes of the equitable claim for reinstatement.' " Gibson v. Mohawk Rubber Co., 695 F.2d 1093, 1101 (8th Cir.1982) (quoting Cleverly v. Western Electric Co., 450 F.Supp. 507, 511 (W.D.Mo.1978), aff'd, 594 F.2d 638 (8th Cir.1979)). See also Hildebrand, 607 F.2d at 713 (Weick, J., concurring); Cancellier v. Federated Department Stores, 672 F.2d 1312, 1319 (9th Cir.), cert. denied, 459 U.S. 859, 103 S.Ct. 131, 74 L.Ed.2d 113 (1982).
 
 
 24
 The district court therefore should have been guided by the jury's finding of discrimination and granted reinstatement. Once discrimination is found, reinstatement should be granted absent exceptional circumstances. Allen v. Autauga County Board of Education, 685 F.2d 1302, 1305 (11th Cir.1982); Kingsville Independent School District v. Cooper, 611 F.2d 1109, 1114 (5th Cir.1980); Moore v. Tangipahoa Parish School Board, 594 F.2d 489, 494-95 (5th Cir.1979). In Allen, the Eleventh Circuit expressed the rationale for the policy favoring reinstatement:
 
 
 25
 This rule of presumptive reinstatement is justified by reason as well as precedent. When a person loses his job, it is at best disingenuous to say that money damages can suffice to make that person whole. The psychological benefits of work are intangible, yet they are real and cannot be ignored.
 
 
 26
 Allen, 685 F.2d at 1306.
 
 
 27
 Federal courts have greatly limited the grounds on which reinstatement may be denied. It is not sufficient that reinstatement might have "disturbing consequences," Sterzing v. Fort Bend Independent School District, 496 F.2d 92, 93 (5th Cir.1974), that it might revive old antagonisms, or that it could "breed difficult working conditions," Allen, 685 F.2d at 1305. " 'Relief is not restricted to that which will be pleasing and free of irritation.' " Allen, 685 F.2d at 1305 (quoting Sterzing, 496 F.2d at 93).
 
 
 28
 In this case, Sears has made no cognizable claim of exceptional circumstances to deny reinstatement. The Troy Sears store is the third largest in the country, with ample numbers of departments in which to place Lewis, and, one imagines, a normal turnover rate among its 600 employees. We fail to see any possible exceptional circumstance to justify keeping her out of that store, and none were brought to our attention.[3] We therefore order that Lewis be reinstated to the first available full-time sales position at the Troy Sears store.[4]
 
 B. Attorney's Fees
 
 29
 Following the jury's verdict, a separate hearing was held on the question of attorney's fees under the Elliot-Larsen Act, Mich.Comp.Laws Ann. Sec. 37.2802. The issue was referred to a magistrate, who determined that plaintiff was entitled to $10,763.50 for attorney's fees and $1,490.31 for costs. Both parties were subsequently permitted to log objections to the magistrate's recommendations. Accepting in part and rejecting in part the magistrate's recommendations, the district court determined that the plaintiff's attorney's fee was $34,200. The court then cut that figure in half, ultimately awarding $17,100 in attorney's fees and $1,490.31 in costs. Plaintiff urges that the district court acted improperly in halving the award. We agree.
 
 
 30
 The district court and the magistrate below both found that the plaintiff was a prevailing party and was therefore entitled to attorney's fees since "the crux of plaintiff's case was discrimination and ... she prevailed on that issue with the jury." (J.A. at 316-17). Both also found that the plaintiff's attorney had adequately documented the number of hours (342) for which he is seeking reimbursement. (J.A. at 319). The district court also found that $100 per hour was a reasonable hourly fee for plaintiff's counsel's work on the case. (J.A. at 319).[5] Using these figures, the district court found that the fee here was $34,200, but it pruned that figure "by one-half to account for the results achieved and the amounts in question ($30,597 in back pay and benefits awarded to plaintiff)." (J.A. at 319-20).
 
 
 31
 It is clear to us that the district court reduced the attorney's fee award because that court failed to order the full relief plaintiff was requesting--namely, reinstatement. In Northcross v. Board of Ed. of Memphis City Schools, 611 F.2d 624, 636 (6th Cir.1979), cert. denied, 447 U.S. 911, 100 S.Ct. 2999, 3000, 64 L.Ed.2d 862 (1980), we found this approach to be improper, holding:
 
 
 32
 The question as to whether the plaintiffs have prevailed is a preliminary determination, necessary before the statute comes into play at all. Once that issue is determined in the plaintiffs' favor, they are entitled to recover attorney's fees for "all time reasonably spent on a matter." The fact that some of that time was spent in pursuing issues on research which was ultimately unproductive, rejected by the court, or mooted by intervening events is wholly irrelevant.
 
 
 33
 The Northcross "prevailing party" requirement was modified by the United States Supreme Court in Hensley v. Eckerhart, 461 U.S. 424, 103 S.Ct. 1933, 76 L.Ed.2d 40 (1983), which was later adopted by this court in Kelley v. Metropolitan County Board of Education, 773 F.2d 677, 685 (6th Cir.1985), cert. denied, 474 U.S. 1083, 106 S.Ct. 853, 88 L.Ed.2d 893 (1986). The modified Kelley standard, which is not a "total break" from the Northcross approach, requires that if the litigation can be viewed as a series of discrete claims, then those claims may be analyzed individually in order to parse out those that were successful from those that were not. If, however, the case effectively revolves around one claim and a core of common facts, as does Lewis' claim, then the "overall result" will remain the primary factor in determining counsel fees. Kelley, 773 F.2d at 685-86; Hensley, 461 U.S. at 435, 103 S.Ct. at 1933. Since Lewis' discrimination claim is not divisible into tidy units, we find that the jury verdict compels the conclusion that Lewis prevailed overall.
 
 
 34
 Moreover, even if we were to agree with defendant's argument that a court may properly segregate out results in a single-issue case such as this one, since we have reversed the district court with respect to reinstatement, it follows that the court's decision with respect to attorney's fees must now be reversed. We are here granting reinstatement; plaintiff's remedy is now therefore whole. Her counsel's award should mirror this change.
 
 
 35
 Accordingly, we reverse the decision below as to the amount of the attorney's fees, and order restoration of the full $34,200 award. Further, we remand to the district court for a determination of the amount of time and money that plaintiff's counsel expended on this appeal, and order that additional amount to be included in the fee award.
 
 C. Sufficiency of the Evidence
 
 36
 On cross-appeal, defendant argues that Lewis failed to carry her burden that the decision to terminate her was based on race. Defendant appeals the denial of its motions for directed verdict,[6] judgment notwithstanding the verdict and new trial, arguing several points: that Lewis did not establish that under similar circumstances, similarly-situated whites were treated differently than she was; that she did not link allegedly different treatment with proof of a discriminatory motive; and that Sears had a legitimate, nondiscriminatory reason for terminating her. Upon review of the evidence, we are unwilling to upset the jury's verdict.
 
 
 37
 We are faced with a weighty standard when contemplating overturning the denial of defendant's motions. A judgment n.o.v. may not be granted unless reasonable minds could not differ as to the conclusions to be drawn from the evidence. Gillham v. Admiral Corp., 523 F.2d 102 (6th Cir.1975), cert. denied, 424 U.S. 913, 96 S.Ct. 1113, 47 L.Ed.2d 318 (1976). An appeals court is not to "weigh the evidence, pass on the credibility of witnesses [and] substitute its judgment for that of the jury." Toth v. Yoder Co., 749 F.2d 1190, 1194 (6th Cir.1984). Instead, we must view the evidence in the light most favorable to the opposing party, drawing all reasonable inferences in her favor. Id.; Morelock v. NCR Corp., 586 F.2d 1096, 1104-05 (6th Cir.1978), cert. denied, 441 U.S. 906, 99 S.Ct. 1995, 60 L.Ed.2d 375 (1979). The trial judge below--even while personally disagreeing with the jury's verdict--recognized the seriousness of toppling a jury verdict and denied Sears' motions for a judgment n.o.v. and new trial. We agree with the district court that the jury was presented with sufficient evidence to reach its conclusion.
 
 
 38
 In addition to proffering evidence that similarly-situated white employees were transferred to other departments instead of being fired, Lewis tendered ample proof to contradict Sears' efforts to explain why those employees were differently situated from Lewis. For example, Sears explained its firing of Lewis by stating that its policy with respect to sub-par salespersons was modified during the time in question to permit firing of those employees, rather than transferring them to other departments. Yet plaintiff adduced evidence that the alleged policy, if it existed, was entirely oral and was applied inconsistently in practice. Moreover, testimony concerning the existence of the policy was impeached at trial.
 
 
 39
 Further, Sears urged at trial that the reasons for the transfers of Ms. Rock and Mr. Kalivoda were because the former, after recuperating from an illness, asked to be reinstated to her no-longer vacant position, and the latter was deficient only in selling maintenance agreements, not big-ticket items themselves. Yet, plaintiff offered evidence that the personnel department assured Rock that she would be reinstated to her old position, and that Sears has no written policy with respect to maintenance agreement performance. Additional examples: Sears contended that employees were transferred for reasons other than poor performance, but evidence revealed that poor performance actually may have been the reason for the transfers. Sears argued that full-time and part-time employees were not treated similarly and were not compared to one another; yet, evidence on the other side showed that all such employees were evaluated by the same criteria. Thus, taken as a whole, we find that a reasonable jury could have found that Sears discriminated against Lewis on the basis of race when it chose to fire her. We therefore affirm the district court's denial of defendant's motions for directed verdict, judgment notwithstanding the verdict and new trial.
 
 D. Jury Instructions
 
 40
 Sears challenges three jury instructions. First, Sears complains of the following instruction, which derives from II Michigan Standard Jury Instructions 2d Sec. 105.03 (Institute Cont. Legal Educ. ed. 1981):
 
 
 41
 Your task is to determine whether the defendant discriminated against Inez Jeanette Lewis. You are not to substitute your judgment for Sears' business judgment or decide the case based on what you would have done.
 
 
 42
 However, you may consider the reasonableness or lack of reasonableness of Sears' stated business judgment, along with that of all the other evidence in determining whether Sears discriminated against Inez Jeanette Lewis.
 
 
 43
 (J.A. at 246). Sears objects to the second paragraph of this instruction as an inaccurate statement of the law with respect to pretext, and as contradicting the first paragraph. Sears argues that a factfinder may not determine if a reason for terminating an employee is sound business judgment; the jury must focus solely on whether the firing was pretextual.
 
 
 44
 We agree that the jury is not to probe the business judgment of the employer. That does not mean, however, that the jury cannot consider the reasonableness of the decision as it illuminates the employer's motivations. Thus, Sears does not have to establish that the basis on which it acted in firing Lewis was sound; rather, Lewis has the burden of demonstrating that Sears' stated reasons are pretextual. One way for Lewis to do this is to show that Sears' asserted business judgment was so "ridden with error that defendant could not honestly have relied upon it." Lieberman v. Gant, 630 F.2d 60, 65 (2d Cir.1980). For example, Sears' business judgment to fire Lewis may have been so unusual or idiosyncratic as to shed light upon Sears' motivation in firing her. The more questionable the employer's reason, the easier it will be for the jury to expose it as pretext. Id.
 
 
 45
 In Loeb v. Textron, 600 F.2d 1003 (1st Cir.1979), and in Texas Department of Community Affairs v. Burdine, 450 U.S. 248, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981), the First Circuit and the United States Supreme Court found that a jury may consider the reasonableness, or lack thereof, of an employer's business judgment, insofar as it may assist in determining the employer's state of mind. See also Lieberman, 630 F.2d at 65. In Loeb, the court wrote that "the reasonableness of the employer's reasons may of course be probative of whether they are pretexts." Loeb, 600 F.2d at 1012 n. 6. In Burdine, the Supreme Court deployed a similar rationale: "The fact that a court may think that the employer [exhibited bad business judgment] does not in itself expose him to Title VII liability, although this may be probative of whether the employer's reasons are pretexts for discrimination." Burdine, 450 U.S. at 259, 101 S.Ct. at 1096. We find, therefore, that the instruction is an accurate statement of the law, and was properly before the jury.
 
 
 46
 In its second challenge to the jury instructions, Sears devotes one paragraph of its brief to the argument that the court erred in refusing to give its Proposed Jury Instruction No. 4, which sets forth the burden of proof in a race discrimination case as adopted by the Supreme Court in Burdine and by the Michigan Court of Appeals in Clark v. Uniroyal Corp., 119 Mich.App. 820, 327 N.W.2d 372 (1982), and Jenkins v. Southeastern Michigan Chapter, American Red Cross, 141 Mich.App. 785, 369 N.W.2d 223 (1985). Sears' proposed instruction read, in part: "The burden of proof is at all times with the Plaintiff to establish that Sears intended to discriminate against the Plaintiff because of her race and that her race was one of the reasons which made a difference in her treatment." (Emphasis supplied) (J.A. at 207).
 
 
 47
 "Burden of proof" is an amorphous term, comprising both the "burden of production" and the "burden of persuasion." See 1X Wigmore on Evidence Secs. 2485-89 (1981). McDonnell Douglas Corp. v. Green, 411 U.S. 792, 800, 93 S.Ct. 1817, 1823, 36 L.Ed.2d 668 (1973) provides the relevant framework for distributing burdens in a Title VII case. A three-step process allocates the shifting burdens of the production of evidence. "The burden of production rests first on the plaintiff to establish his prima facie case, then on the defendant to articulate some legitimate, nondiscriminatory reason for the employee's rejection," and finally again on the plaintiff to show that the defendant's reasons are pretextual. McDonnell Douglas, 411 U.S. at 804, 93 S.Ct. at 1825; see also Chappell v. GTE Products Corp., 803 F.2d 261, 265 (6th Cir.1986), cert. denied, --- U.S. ----, 107 S.Ct. 1375, 94 L.Ed.2d 690 (1987). Thus, the burden of production is not forever on one party; rather, it is an evidentiary tool that shifts from one party to another. It is the burden of persuasion that rests at all times with the plaintiff. Chappell, 803 F.2d at 265. Defendant's proposed instruction--stating that the burden of proof rests at all times with the plaintiff--is therefore an ambiguous and potentially confusing statement of the law.
 
 
 48
 At trial, the given jury instruction on the burden of proof was taken directly from II Michigan Standard Jury Instructions 2d Sec. 105.04:
 
 
 49
 Plaintiff has the burden of proving that race was one of the motives or reasons which made a difference in determining to discharge the plaintiff.
 
 
 50
 Your verdict will be for the plaintiff if you find that race was one of the motives or reasons which made a difference in determining to discharge the plaintiff.
 
 
 51
 Your verdict will be for the defendant if you find that race was not one of the motives or reasons which made a difference in determining to discharge the plaintiff.
 
 
 52
 (J.A. at 248).
 
 
 53
 The Michigan Supreme Court Committee on Jury Instructions, in its drafting of the above standard instruction, considered and "deliberately eschewed" the McDonnell Douglas shifting-burdens formulation, stating specifically that such an instruction would: " 'add little to the juror's understanding of the case and, even worse, may lead jurors to abandon their own judgment and to seize upon poorly understood legalisms to decide the ultimate question of discrimination.' ..." II Michigan Standard Jury Instructions 2d, Employment Discrimination Introduction 17-5 (citing Loeb v. Textron, 600 F.2d 1003, 1016 (1st Cir.1979)). We agree with the Committee on Jury Instructions. Rather than confuse the jurors with legal definitions of the burdens of proof, persuasion and production and how they shift under McDonnell Douglas, we find that the above instruction was a clear and preferable statement of the law. We therefore find no error in the district court's decision not to give defendant's Proposed Instruction No. 4.
 
 
 54
 Finally, Sears also challenges plaintiff's Instruction No. L6:
 
 
 55
 Sears has presented evidence that one person involved in the decision to discharge Ms. Lewis was black. The law treats all persons alike. If you should find that the plaintiff's race was a factor which made a difference in Sears' decision to discharge her, the fact that one of the officials involved in that decision was black would make no difference.
 
 
 56
 (J.A. at 247). Sears argues that this jury instruction had the effect of commenting to the jurors upon the credibility of Eugene White, the Troy Store manager. Moreover, Sears suggests that the legal principle with respect to such a jury instruction is that a black official who administers discipline to another black person serves to negate any inference of racial discrimination. We disagree with defendant's assertions.
 
 
 57
 First, we find that the court did not comment upon Mr. White's credibility merely because he was mentioned in a jury instruction. The instruction simply stated that if the jury found that Sears discriminated against plaintiff because of her race, the color of one of the officers involved would make no difference.
 
 
 58
 Even more fundamentally, however, we find it surprising that defendant would have us sanction the inference they wish to draw from the presence of one black man in a supervisory position at Sears. Does defendant mean to imply that, because blacks, women, or older persons are involved in the decision-making structure of a company, then race, sex or age discrimination cannot occur? The mere presence of one black person in the decision-making process cannot shield a company from liability under civil rights statutes. Those statutes prohibit any agent of any employer from discriminating against persons because of race. See Elliott-Larsen Act, Mich.Comp.Laws Ann. Sec. 37.2202(1). To allow the inference that defendants wish to make would obliterate the protections enshrined in laws targeting special classes of people. We are firmly opposed to taking such a stance, and affirm the district court's decision to give the above instruction.
 
 E. Remittitur
 
 59
 Finally, Sears urges that its motion for remittitur was improperly denied. Specifically, Sears contends that since Lewis did not present any evidence regarding her potential earnings for 1984 and 1985, the jury's damage award was therefore based only on plaintiff's counsel's comments to them as to plaintiff's wage loss. Sears' own evidence as to Lewis' earning potential consisted of a statement by store manager White that Lewis' salary would have been halved if she had been transferred to another department. Sears requests that the damages award be adjusted downward accordingly, from $30,597 to $15,413.[7] Again, we disagree.
 
 
 60
 Where a jury grants a particular damage award and the district court refuses to disturb that finding, an appellate court should be certain indeed that the award is contrary to all reason before it orders a remittitur or a new trial. See Manning v. Altec, Inc., 488 F.2d 127, 133 (6th Cir.1973). A motion for remittitur should only be granted if the award clearly exceeds " 'the amount which, under the evidence in the case, was the maximum that the jury reasonably could find to be compensatory' " for the plaintiff's loss. Id. at 132 (quoting Gorsalitz v. Olin Matheson Chem. Corp., 456 F.2d 180, 181 (5th Cir.), cert. denied, 407 U.S. 921, 92 S.Ct. 2463, 32 L.Ed.2d 807 reh'g denied, 409 U.S. 899, 93 S.Ct. 108, 34 L.Ed.2d 159 (1972)). See also Green v. Francis, 705 F.2d 846, 850 (6th Cir.1983) (per curiam); Jones v. Wittenberg University, 534 F.2d 1203, 1212 (6th Cir.1976); Brewer v. Uniroyal, Inc., 498 F.2d 973, 977-78 (6th Cir.1974). We can only reverse the district court's denial of such a motion upon a showing of abuse of discretion. We find no such abuse here.
 
 
 61
 The jury very well may have found that Sears would have retained Lewis' base salary, or that she might have been transferred to another department with comparable compensation, or that her supervisor's remark that her pay would have been cut in half was simply not credible. There are many possible explanations for the jury's damage award; as long as this is so, we will allow it to stand. We are unwilling to foil the jury's attempt to mete out justice as long as there exists some possible rationale for their verdict.
 
 
 62
 Accordingly, we affirm the district court on all cross-appeal issues.
 
 III.
 CONCLUSION
 
 63
 For the foregoing reasons, we AFFIRM in part, REVERSE in part and order reinstatement and full attorney's fees, and REMAND this case back to the district court for an additional fee determination based on the work done by plaintiff's counsel on this appeal.
 
 
 64
 DAVID A. NELSON, Circuit Judge, dissenting.
 
 
 65
 After reading the transcript of the testimony presented at trial, I am left with an abiding conviction that the trial judge came very close to the mark when he said, as he did say in his findings of fact, that the record is "devoid" of evidence that Sears discharged Mrs. Lewis because of her race.
 
 
 66
 The trial judge found, and I believe the record shows, that
 
 
 67
 " '[i]t is uncontroverted that the defendant Sears, as a result of falling on harder times, changed its policy in January, 1983, so that there would be no more transfers for poor performers among full-time employees, but they would be discharged. This policy did not apply to part-time employees."
 
 
 68
 The judge went on to say, in the penultimate paragraph of his findings of fact, that
 
 
 69
 "[r]ace was not a factor which made a difference in the decision to discharge plaintiff. Indeed, White, the store manager, who is black, detailed at length and in depth his care and concern for doing everything possible to maintain and/or increase the level of black employees in defendant's Troy store, the second largest sales producer in the nation. As a matter of fact, in White's desire to give her every chance and retain her as an employee, he procrastinated on at least two occasions from forwarding her name for termination. * * * To his credit, even though he knew he was losing credibility for his failure to carry through on her termination, he kept her on through the month of December [1983] knowing it was a good month for sales; and he hoped she would come through, which she did not."
 
 
 70
 If the trial judge was correct in his view that the record in this case is "devoid" of any evidence of illegal discrimination against Mrs. Lewis, the judge had a duty either to direct a verdict in favor of Sears or to grant Sears' motion for judgment non obstante veredicto. If the record was not totally devoid of evidence suggestive of unlawful discrimination, however, I am convinced that the trial court ought to have granted Sears' motion for a new trial after the jury brought in a verdict for the plaintiff. The failure to order a new trial was, I believe, an abuse of discretion that ought to be corrected by this court. Perhaps I may be pardoned for offering a fairly detailed explanation of the reasons for my conclusion.
 
 
 71
 * * *
 
 
 72
 * * *
 
 
 73
 Mrs. Lewis first applied for work at Sears on August 2, 1963--a date prior to enactment of Michigan's Elliott-Larsen Civil Rights Act and prior to enactment of the federal Civil Rights Act of 1964. Sears gave her a job. Mrs. Lewis became a stock person in the lingerie department of the store Sears was about to open in the greater Detroit community of Troy, Michigan.
 
 
 74
 In 1968 Mrs. Lewis applied for promotion to a sales job in the infants' wear department. Sears promoted her.
 
 
 75
 In 1976 Mrs. Lewis applied for promotion to a job selling washers and dryers, "big ticket items" that Sears did an outstanding job of "pre-selling." Again Sears promoted Mrs. Lewis. For the next seven or eight years she held one of the most desirable sales jobs in one of the largest Sears stores in the country.
 
 
 76
 Business at the Troy store was excellent during much of the decade of the '70s, and no full-time big ticket salesperson was ever fired for poor performance until 1983. In July of that year, however, a white male, Mr. Kleczkowski, was let go because of consistently poor sales performance. Mr. Kleczkowski was the first to be dismissed for this reason, but not the last. The employment of another white male, Mr. Kern, was terminated in July of 1984 on the same grounds.
 
 
 77
 The dismissals of these salesmen, like the dismissal of Mrs. Lewis in February of 1984, occurred after an economic downturn that began toward the end of the 1970s and that hit the automobile capital of the United States especially hard. As explained by Mr. Machovec, a merchandising manager at the Troy store.
 
 
 78
 "expenses in the store were rising and the sales were falling and the unemployment was rising because of the oil prices, gasoline prices were up. People weren't buying big cars. If they were buying anything at all, they were buying small ones and as that progressed the profits of Sears Roebuck diminished in the Detroit area as well as other areas but especially in Detroit."
 
 
 79
 Initially, as Mr. Machovec went on to explain, "we did not lay off people, we kept people on the payroll and we talked to them about production and 'If you are going to stay with Sears, you are going to have to give us the production we need to make money so we can stay open or none of us are going to have jobs.' " The Troy store did stay open, of course, but some consistently poor producers eventually lost their jobs. There is no persuasive evidence that they lost their jobs because Sears discriminated against black people.
 
 
 80
 At the end of 1980 the manager of the Troy store retired. He was replaced, effective January 1, 1981, by Mr. Eugene White--himself a black man. Mr. White had started with Sears as a porter and maintenance worker in 1956, and had gradually worked his way up through the ranks in a series of increasingly responsible positions.
 
 
 81
 The record suggests that Mr. White was more of a "disciplinarian" than his predecessor, and Mr. White had to face an economic environment considerably harsher than that which had prevailed in earlier years. As the decade of the 1980s progressed, Mr. White--and the Sears organization generally--began documenting and formally evaluating the performance of sales employees, trying to encourage poor performers to do better. The record does not indicate that Mr. White or anyone else participating in the evaluation process intended to deal more harshly with black people than with white people.
 
 
 82
 In June of 1982--more than a year and a half before she was finally discharged--Mr. Lewis was summoned to a "deficiency interview" with Mr. White, Mr. Machovec, and the manager of Mrs. Lewis' department. Mr. White (who was the head of the entire store, it will be recalled) was present because "we wanted the employee to realize the severity of the situation...."
 
 
 83
 The situation that led to the deficiency interview in June of 1982 was that in each of the preceding five months Mrs. Lewis had been ranked dead last, among all the salespeople in her division, in terms of total sales, in terms of sales per hour, in terms of merchandise units sold, and in terms of the dollar amounts of maintenance agreements sold on those units. The numbers were set out in a chart attached to a memorandum that was presented to Mrs. Lewis at the deficiency interview. The chart confirmed, as the memorandum stated, that "Jeannette is clearly deficient to all other sales people and divisional standards...." The memorandum concluded with these words: "She must understand that continued sub-par performance will result in a loss of employment at Sears, Roebuck and Co."
 
 
 84
 Mrs. Lewis was not singled out for a deficiency interview in 1982 because of her race; the testimony showed without contradiction that it was "[b]ecause she had a last rating to all the other people in the division that she worked in for approximately the first six months of the year." Mr. White evidenced no antipathy toward people of his own race, and when he was able to do so, he promoted them to better paying jobs. In the case of a black employee named Ardena Payne, for example, Mr. White testified that shortly after he became the manager of the Troy store the employee requested and received a promotion to a big-ticket sales job after an interview that Mr. White described as follows:
 
 
 85
 "She's glad I'm at the store, number one, because of my race. And she feels, because of my race, that maybe we as blacks can get some breaks in the store. And I emphasized to Ardena that, yes, they will get some breaks, but you'll have to earn them."
 
 
 86
 It is abundantly clear that Mr. White was prepared to promote black people and to discharge white people; the test, in each case, was performance, not color.
 
 
 87
 Mrs. Lewis' performance improved for a time after the deficiency interview in June of 1982, but it slipped again in 1983. Unfortunately for her, this was a period when economic conditions had finally forced Sears to get tougher on full-time salespeople who were consistently poor performers. Instead of transferring such people to lower paying jobs in other departments, Sears began to let the employees go if they could not improve their performance. In testimony that was "uncontroverted," as the district court accurately stated, Mr. White stated, under oath, that
 
 
 88
 "in early '83 we store managers in the department group were instructed by our ... group manager, that we no longer keep malingerers on the payroll; that they either had to be productive workers or we had no room for them. And that we, as store managers, would have to take a tougher stand on the employees which we had. Either we had to ... train them and develop them to do the job, give them the opportunity to do that, to bring themselves up, [and] [i]f they could not do that, then we could no longer transfer these employees [to other departments.]"
 
 
 89
 The group manager did not reduce his instructions to writing, but Mr. White heard what was said, just as Mr. Machovec did. The fact that these instructions were oral rather than written hardly means that the store manager and his staff were at liberty to ignore them. Appellate judges, like law professors and law clerks, spend much of their time in a world made of paper; perhaps we sometimes need to remind ourselves that there exists a larger world where that which is real is not confined to that which is written.
 
 
 90
 Be that as it may, the paper record leaves no room for doubt that when measured against the performance of all the employees in her department, both full-time and part-time, Mrs. Lewis' sales-per-hour performance for the entire year of 1983 put her exactly where she had been in the first half of 1982; she ranked last. The department, moreover, had become more than twice as big; in July of 1983 the group selling washers and dryers was combined with the group selling stoves, refrigerators, dishwashers, and other big ticket items. (Mrs. Lewis attributed her admittedly poor sales record to the combining of the departments, among other reasons; she was not familiar with the other product lines, and she testified to difficulty in acquiring the knowledge necessary to sell products with which she had not previously been familiar. The other members of her old department faced exactly the same problem, of course, but they dealt with it more effectively than she did.)
 
 
 91
 The paper record also shows that although Mrs. Lewis was repeatedly told she would be discharged if her performance did not improve promptly, Sears put off the actual termination month after month. Mr. White's thinking on this is instructive. "I wanted to give her every chance to get up in the average," he testified. After going through a whole series of memoranda on deficiency interviews conducted with Mrs. Lewis every month, Mr. White explained that
 
 
 92
 "December normally is a pretty good months [sic] in appliances, and I'm still hoping that she's going to have a ... month to get her out of this. And I'm ... procrastinating and not acting on it. I'm trying to give her an administrative break, really, by not following through. I know I'm losing credibility with her because I've told her on at least two occasions that I was going to forward her file [to Sears' Chicago headquarters for discharge action] if her performance doesn't improve, and I'm not getting what I'm seeking really.
 
 
 93
 * * *
 
 
 94
 * * *
 
 
 95
 "Q. Now, you gave her these goals for December. Did she make them?
 
 
 96
 A. No, she didn't.
 
 
 97
 Q. Did she say anything at the December review, that you can recall?
 
 
 98
 A. Again that, 'I'm trying. I'm doing the best I can.'
 
 
 99
 Q. Why what did you tell her in response?
 
 
 100
 A. The same response, 'Jeanette, you have to try harder.' I spoke positive with Jeanette, never negatively. I always wanted her to work herself out of this here deficiency. I tried to instill confidence in her to go out and do the job. Her response is that, 'I'm doing the best I can.' I said, 'Jeanette, this is the reason you're here, because your best is not good enough.' "
 
 
 101
 Mr. White may not be the world's greatest psychologist or greatest diplomat, and for Mrs. Lewis to be told, as she was told repeatedly, that "your best is not good enough" may well have been counterproductive. Mrs. Lewis' testimony suggests that the repeated deficiency interviews made her feel nervous and pressured, and perhaps they made it harder for her to improve her sales performance. To suppose that Mr. White was purposely trying to force Mrs. Lewis out of the Sears organization because of her race, however, would be absurd. Mr. White, as he testified, was well aware of the fact that
 
 
 102
 "there are [a] limited number of blacks that we have in a unit in commission selling [and firing a black was a negative] because I'm black. I have sensitivity towards that as well. But I must treat all my employees fairly and equal. And, as I said, its not fun for me to release any employee, regardless of whether ... white or black. But whenever you have [a] limited number of blacks in an organization and you have to release one of them, that hurts. You don't have representation and that hurts deeply, so I had all the reasons for her to make it. I wanted her to make it. I wanted to be the one to say she made it. I didn't want to be the one to say she failed."
 
 
 103
 Mrs. Lewis concedes that her performance was deficient, and her only complaint of discrimination is that she was not given the opportunity to transfer to another department. This is an important point, and it bears repeating--Mrs. Lewis' only complaint is that she was not allowed to transfer. As she herself testified, however, not once, in all of the meetings she had with her superiors over the year and half preceding the date of her discharge, did she ever request a transfer to another department. A transfer, Mr. White testified, would probably have cost her a 50% cut in pay. She did not request that, and Sears did not offer it.
 
 
 104
 It is true that on the day she was notified of her discharge Mrs. Lewis asked if she could not be put elsewhere in the store instead of being fired. She was told, she testified, that "we do not transfer anymore." That is consistent with the policy established by the group manager in 1983. Moreover, as Mr. Machovec testified, "there weren't any openings for full-time people in the store" in February of 1984. There was no evidence that any such opening existed. What the evidence did show was that not a single new full-time sales employee was hired for Sears' Troy store in all of 1983, 1984 or 1985.
 
 
 105
 The only conceivable justification for submission of the plaintiff's Elliott-Larsen Act claim to the jury was that over a period of several years a handful of white employees whose sales performances were not uniformly stellar did move from one department to another. That evidence, as I read it, was not sufficient to support the jury's verdict.
 
 
 106
 The first two transfers in question--those of Earl Lock and Daniel Kleczkowski--occurred prior to 1983, and thus have no real significance. Mr. White's testimony clearly fixed January of 1983 as the month in which he received his instructions on transferring unproductive workers, and that testimony was uncontroverted.
 
 
 107
 The next transferred employee in question, Margaret Rock, had not consistently been the lowest performer in her department in 1981 and 1982, despite a serious illness in those years. Her performance had steadily improved in prior years. Ms. Rock was off on sick leave from May to October of 1983, and upon her return she was put to work selling cameras, rather than home appliances, because the camera department was where she was needed at that time. The uncontradicted evidence showed she was not transferred because of poor sales.
 
 
 108
 The next transferred employee, Vaclav Kalivoda, was one of the top salesmen in the store. The plaintiff herself agreed that this was true. Mr. Kalivoda's only deficiency was in selling maintenance agreements. Sears had a written policy--a copy of which was received in evidence--that prohibited the discharge of salespersons solely because of poor performance on maintenance agreements. Upon his transfer, Mr. Kalivoda was replaced in the home appliance department by a black woman--a circumstance that does not, to my mind, evidence a bias on Sears' part against persons of Mrs. Lewis' race and gender. (The black woman was still in that department at the time of trial, and was doing very well there, according to Mr. White.)
 
 
 109
 The next employee, Joanne Phillips, was promoted to the vacuum cleaner and sewing machine department in October of 1983 to replace a black woman who was being promoted out of that department to a better job. Ms. Phillips' performance in vacuum cleaner sales improved as she gained experience there, and she was not given a single deficiency interview. No one ever threatened to fire her because of poor sales performance. It is true that she was transferred to another department in the fall of 1984, but Mr. White testified without contradiction that his store and one other in the Detroit group were participants in a test program that required him to select an employee for transfer to this particular department. Ms. Phillips was selected for transfer on the basis of her seniority, and the transfer was not viewed by her or by management as an alternative to discharge.
 
 
 110
 The final employee in question, Ms. Sylvain, was a part-time employee. As a part-timer, she was subject to transfer in a way that Mrs. Lewis, a full-time employee, was not. The record established--again without contradiction--that the workload in different departments varied seasonally, and that part-time employees were routinely transferred from one department to another as departmental personnel needs expanded and contracted. Ms. Sylvain, as Mr. White testified, was transferred from the appliances department to the fine jewelry department, subsequent to Mrs. Lewis' discharge, "because of the needs of the unit." The Christmas selling season was approaching, and the sales manager responsible for the jewelry department wanted someone with experience in commission selling; Ms. Sylvain, a part-timer eligible for transfer, happened to be the one selected. Ms. Sylvain was not transferred for disciplinary reasons, Mr. White explained, but because she was needed in the jewelry department.
 
 
 111
 Mr. White testified as follows in explaining why it was part-timers who were transferred to meet changing seasonal needs:
 
 
 112
 "Q. You say the only ones you move in doing that are part-timers?
 
 
 113
 A. That's correct.
 
 
 114
 Q. Why? Why not move full-timers?
 
 
 115
 A. Well, there's several reasons you wouldn't move a full-timer. You use full-timers 40 hours a week, 52 weeks a year in a particular department. You depend on their product knowledge and they will be there through the peaks and valleys of all the business within the year. Part-timers understand and know that they will go to particular divisions during the peak, or someone gets ill, or if off on extended illness, that they will be subject to replace that part-timer or full-timer in a particular department. So we have more flexibility with part-time employees than we do in full-time, as far as moving them around to the stores' needs."
 
 
 116
 Nowhere in the record is there any hint that Mrs. Lewis ever asked to be placed on part-time status so as to be eligible for the kind of transfer received by Ms. Sylvain.
 
 
 117
 On balance, as I read the record in this case, the evidence that Mrs. Lewis was not a victim of racial discrimination is simply overwhelming. The loss of her job was a tragedy for Mrs. Lewis to be sure, and on an emotional level it is hard to fault the trial judge for entering judgment in her favor even though the judge himself did not believe that she was discriminated against improperly. Quite apart from the legality of the trial judge's action, however, I must say that I think the social consequences of such decisions could prove unfortunate--and our compassion for the individual whose name we happen to know should not extinguish our compassion for those whose names are unknown to us, but who will nonetheless be affected by what we do.
 
 
 118
 If an employer who hires significant numbers of black or other minority employees finds that the courts are granting those employees life tenure regardless of their performance, it would not be irrational for the employer--or the employer's competitors--to become as cautious as the law allows about offering jobs to minority applicants whose qualifications are in any way questionable. There are many job applicants whose performance would be hard to predict without giving them an opportunity to show what they can do on the job--and if those employees who do not work out well cannot be fired, is it not more likely that those who might work out well will not be hired in the first place?
 
 
 119
 Retailing is a highly competitive business, and no federal law can require the retailer who is permanently saddled with a sub-par sales force to grow and wax prosperous. Private-sector employers who do not prosper, in this country, do not hire people. What Sears told the work force in Troy is obviously true: "we need to make money so we can stay open or none of us are going to have jobs." In the long run, it seems to me, decisions such as that made by the trial court in this case could well mean fewer jobs for those who need them most.
 
 
 120
 I would send the case back for a new trial, and I respectfully dissent from the panel's decision not to do so.
 
 
 
 [1]
 The Michigan Elliott-Larsen Act and Title VII of the Civil Rights Act of 1964 are similar statutes, except that the protections enshrined in the Elliott-Larsen Act extend to more groups than under Title VII, and a jury trial may be had under Elliott-Larsen, whereas Title VII is an equitable claim. Compare 42 U.S.C. Sec. 2000e-2(a) and Mich.Comp.Laws Ann. Sec. 37.2202(1)
 
 
 [2]
 In an oft-cited concurring opinion in D'Oench, Duhme & Co. v. Federal Deposit Insurance Corporation, 315 U.S. 447, 471-72, 62 S.Ct. 676, 686, 86 L.Ed. 956 (1942), Justice Jackson wrote:
 A federal court sitting in a non-diversity case such as this does not sit as a local tribunal. In some cases it may see fit for special reasons to give the law of a particular state highly persuasive or even controlling effect, but in the last analysis its decision turns upon the law of the United States, not that of any state. Federal law is no juridical chameleon, changing complexion to match that of each state wherein lawsuits happen to be commenced because of the accidents of service of process and of the application of the venue statutes. It is found in the federal Constitution, statutes, or common law. Federal common law implements the federal Constitution and statutes, and is conditioned by them. Within these limits, federal courts are free to apply the traditional common-law techniques of decision and to draw upon all the sources of the common law in cases such as the present.
 (Footnote omitted).
 
 
 [3]
 In a footnote, Sears does mention as a hardship that to reinstate Lewis, Sears would be forced to displace a non-culpable employee since there are no full-time positions currently available at the Troy Sears store. We are unconvinced by this argument. We do not ask that Sears fire someone to make room for Lewis; we ask only that she be reinstated to the first available sales opening, and be awarded her full salary until such a position becomes available
 
 
 [4]
 Note that Lewis asked to be reinstated to a big-ticket sales position. We take no position with respect to this request. As the evidence demonstrated, Lewis was undisputably deficient in sales of big-ticket items. The gravamen of her complaint is that she was not transferred from a big-ticket area to another department. While we are sympathetic to her legal claims, we cannot place her in a better position than she would have been in absent the discrimination. Consistent with her request for a transfer, we therefore only order that Lewis be reinstated to a position as a full-time salesperson, allowing Sears to make the determination as to the department in which her talents are best suited
 
 
 [5]
 According to plaintiff's brief at p. 31, the district court reached this figure by calculating plaintiff's attorney's usual rate of $75 per hour for work done on a strict hourly basis, and increasing it by one third due to the contingent nature of the case
 
 
 [6]
 Plaintiff argues that Sears did not preserve an objection to the sufficiency of the evidence by properly moving for a directed verdict at the close of the evidence. Sears did, however, make an earlier motion for a directed verdict, which the trial judge took under advisement. (J.A. at 604-21). We do not believe that Sears was under the obligation to renew that motion at the close of proofs, three and one-half hours after the initial directed verdict motion. See Farley Transportation Co., Inc. v. Santa Fe Trail Transportation Co., 786 F.2d 1342, 1346 (9th Cir.1985). If plaintiff was prejudiced by Sears' failure to renew, plaintiff might have fared better raising this issue to the district court in post-trial proceedings. See Beauford v. Sisters of Mercy-Province of Detroit, Inc., 816 F.2d 1104, 1108 n. 3 (6th Cir.), cert. denied, --- U.S. ----, 108 S.Ct. 259, 98 L.Ed.2d 217 (1987)
 
 
 [7]
 According to Sears' brief at p. 39, this figure was derived by calculating an $11,324 per year salary (one-half of Lewis' 1983 earnings based on testimony that Lewis' salary would have been reduced by half if she had been transferred to another department), for twenty-one months ($19,817), plus $2,264 in lost benefits, minus severance pay and interim earnings of $6,668. The $30,597 figure was arrived at based upon a $20,000 annual salary, for 21 months ($35,000), plus $2,264 in lost benefits, minus the severance pay and interim earnings of $6,668