42 F.3d 1388
 NOTICE: Sixth Circuit Rule 24(c) states that citation of unpublished dispositions is disfavored except for establishing res judicata, estoppel, or the law of the case and requires service of copies of cited unpublished dispositions of the Sixth Circuit.
Terri L. GILLENTINE, Plaintiff-Appellee Cross-Appellant,
Debra Young, Plaintiff-Appellee,
v.
Donald E. VANZANT, et al., Defendants-Appellants Cross-Appellees.
 Nos. 92-4291, 92-4303.
 United States Court of Appeals, Sixth Circuit.
 Dec. 9, 1994.
 
 Before: KEITH, WELLFORD, and MILBURN, Circuit Judges.
 PER CURIAM.
 
 
 1
 Defendants-Appellants Donald E. Vanzant, Michael A. August, Dennis E. Halloran, and Stephen Bryant ("Defendants"), officers with the Dayton Police Department, appeal the jury verdicts and damage awards in favor of Plaintiffs Terri L. Gillentine ("Gillentine") and Debra Young ("Young") on their state law claims alleging assault and battery, and claims alleging violations of their civil rights as enforced by 42 U.S.C. Sec. 1983. Cross-Appellant Gillentine appeals the jury's damage award and district court's denial of her motion for new trial on damages. For the reasons stated below, we AFFIRM the judgments in favor of the Plaintiffs and AFFIRM all damage awards.
 
 I. Statement of the Case
 
 2
 On the evening of March 18, 1989, Plaintiffs Young and Gillentine went to a movie with their neighbor John Berge ("Berge"). After the movie, Young and Gillentine went to the 1470 West dance club in Kettering, Ohio. After a couple of hours at the nightclub, Young saw Michael Osborne ("Osborne") and told him she was not feeling well. She allegedly put her head on his shoulder and then fell to the floor landing on her face. Osborne accompanied Young outside and Gillentine proceeded to take Young home. Young testified that as a result of the fall, she received a small cut on her chin and chipped two eye-teeth.
 
 
 3
 After Gillentine and Young returned home, Berge came over and examined Young's chin. He testified that she had a small cut and some blood on her chin and was crying. He did not observe any other marks on Young. The three decided Young should go to Grandview Hospital to prevent any infection or scarring. Another neighbor, Ted Voise ("Voise") saw the women before they left for the hospital and testified that Young had a "slight abrasion" on her chin.
 
 
 4
 As the women left their apartment house for the hospital, they heard another woman crying for help and found a naked woman crouched by a nearby car. The woman was bruised and upset and Young gave her coat to the woman. Young and Gillentine took the woman inside where she explained she had been raped and beaten by several men who then threw her out in the street. Young and Gillentine asked the woman if she wanted to go to the hospital or if they should call the police. After the woman emphatically rejected these suggestions and indicated she wanted to go home, Voise offered to drive her home. Young and Gillentine then went to Grandview Hospital which was located across the street.
 
 
 5
 The women testified that they walked around Grandview Hospital searching for an open door. Following signs for the main entrance, the women ended up behind the hospital on a paved area leading to the main entrance. At that time, the women testified they heard a male voice telling them to come and get in the car. Gillentine testified that she glanced over her shoulder, saw only headlights and replied "fuck you, leave us the fuck alone."
 
 
 6
 At this point the Plaintiffs' and Defendants' versions of the facts diverge markedly. The women testified that they could not see who was speaking because the headlights of a car blinded them. Because it was 1:30 a.m., and the women were afraid after what had happened to the woman in front of their apartment house, they ignored the request. Gillentine testified that she kept walking until her arm was yanked from behind which threw her to the ground. Young testified that she saw a man kneeling over Gillentine with his knee in her back. Young stated she was then grabbed in a bear hug from behind and started screaming. At some point, Young realized that the man kneeling on Gillentine was a police officer.
 
 
 7
 The officers asserted they were dispatched to the Grandview Hospital area after a report of a rape and saw two women at the rear of the hospital. Officer Donald Vanzant ("Vanzant") testified that they immediately identified themselves as police and asked the women to stop. After he saw Young's injury he allegedly told them "we were there to help the young lady that was injured" and told Young they would escort her to the emergency entrance. At this time, according to Vanzant, Gillentine swore at him and then punched him in the face. Officer Vanzant testified that he arrested Gillentine because she punched him in the face; he denied using any force during the arrest.
 
 
 8
 Gillentine remembered being on the ground and having her left arm jerked behind her and put into handcuffs. After Officer Vanzant handcuffed her, he picked her up by the handcuffs and put her into the police cruiser. Gillentine noticed that a different man, Officer Michael August ("August"), was holding Young in a bear hug. Gillentine testified that Young was screaming "stop hurting her, stop hurting her."
 
 
 9
 Young testified that August handcuffed her and a different officer led her to the back side of the police cruiser. At this time, Young stated that Officer Vanzant took over. Officer Vanzant used the handcuffs to pull Young's arms over her head behind her back, and pushed her upper body onto the car. According to Young, Vanzant grabbed her neck, yelled at her to shut up and when she continued screaming, he slammed her face repeatedly into the back of the police cruiser. The impact of her face against the cruiser ripped a mole off her face, widened the cut on her chin, scratched her neck and caused blood to come out of her mouth. Young stated that her blood was left on the back of the cruiser. Young indicated that after this episode she could not move her jaw and could not speak properly. Gillentine corroborated these events which she viewed from the police cruiser.
 
 
 10
 Officer Vanzant admitted he held Young's arms behind her and forced her body onto the cruiser, but denies pushing her face into the cruiser. Officers Vanzant, August and Stephen Bryant ("Bryant") each testified that before Young was placed in the cruiser, Young was screaming at them during the altercation trying to help her friend. Within a report August made with internal affairs, he stated that Young's blood was all over their car and on the ground. At trial he recanted this admission and testified that the blood on Young's chin was dried at all times explaining that Young was spitting blood on the ground and on the car.
 
 
 11
 Bryant denied seeing any blood in the area as did Grandview security personnel testifying for the Defendants. Another Grandview security guard testified that all events had been captured by a security video camera. According to him, and another guard, the tape did not support Young's version of the facts. This tape, however, was erased subsequently.
 
 
 12
 After arresting the women, the officers called Sergeant Dennis Halloran ("Halloran") to the scene. Halloran and another officer interviewed the women and the officers took the women into Grandview Hospital. Because the Police Department had a contract with Miami Valley Hospital, the officers transported the women to Miami Valley where Dr. Jeffrey Snyder ("Dr. Snyder"), the attending emergency room physician, examined both women.
 
 
 13
 Dr. Snyder observed that Young had an obvious laceration to her chin, bruising on her face, and fingernail marks on her neck. In addition, Dr. Snyder noticed two teeth were fractured and Young had a contusion on her right cheekbone. Dr. Snyder described the laceration on Young's chin as a "very jagged" laceration measuring about 3 cm, or 1 1/2 inches. Dr. Snyder called a plastic surgeon to suture the laceration. Upon Young's request, Dr. Snyder also photographed Young's injuries. Because Young indicated she had suffered two head injuries that night--one from the fall, and another from the police--Dr. Snyder ordered a neurological exam. After further examination, Dr. Snyder found Young had a malocclusion of the jaw, meaning her teeth no longer came together correctly. According to Dr. Snyder, Young's teeth were about 1/2 inch, or 1 cm, off. He testified that Young could not talk very well and had to talk through clenched teeth because of her injury. At trial, Dr. Snyder opined that Young could not have screamed, or opened her mouth wide enough to scream, with the injury to the jaw he observed.
 
 
 14
 According to Dr. Snyder, a malocclusion like Young's was consistent with a fracture of the jaw. Because Dr. Snyder believed Young's jaw was fractured, he ordered X-rays and called the Hospital's dental specialist. Although Snyder and a resident found a jaw fracture, the dental specialist, now deceased, did not.
 
 
 15
 Dr. Snyder testified that Young's injuries were consistent with what she told him had happened with the police. According to Dr. Snyder, the mechanism of injury inflicted by Officer Vanzant to Young's jaw was the direct and proximate cause of her injuries. Plaintiffs' counsel elicited Dr. Snyder's testimony during the following colloquy:
 
 
 16
 Ms. Soter: Let me ask you, doctor, to assume that prior to having had--been--had her face forced into some portion of the cruiser, that Debra Young had no problems speaking, that she was able to open up her mouth, that she was screaming, that after she had her face forced into the cruiser, she had an inability to open her mouth and her teeth were clenched together and she had trouble speaking, based upon those assumptions, can you tell me if you have an opinion, to a reasonable degree of medical certainty, whether or not the having her face forced into some portion of the cruiser was or was not the proximate cause of the broken mandible?
 
 
 17
 * * *
 
 
 18
 * * *
 
 
 19
 Dr. Snyder: With those assumptions I would say that was consistent with the findings I saw, yes.
 
 
 20
 Ms. Soter: And again, for--does the word consistent with, to you, mean the same thing as my question saying do you believe it was directly and proximately caused by?
 
 
 21
 Dr. Snyder: With those assumptions, I will just answer yes.
 
 
 22
 JA at 650-51.
 
 
 23
 Further testimony revealed that Dr. Snyder based his opinion on information from the entire night, including both the fall at the bar and the incident with the police. JA at 647. On cross-examination, Dr. Snyder testified the malocclusion could have occurred from the fall in the bar or any type of impact of a blunt object into one's chin. He indicated, however, that Young would not be able to scream with such an injury.
 
 
 24
 There is some confusion as to whether Young told Dr. Snyder about the cut on her chin she received at the bar because Dr. Snyder's report noted only that she had fallen and injured two teeth. Young testified she did tell him, or someone, she had cut her chin. In addition, Dr. Snyder's testified he saw the "nurses notes" which documented that Young had fallen at a bar and injured her chin.
 
 
 25
 With respect to Gillentine, Dr. Snyder found she had two separate contusions on her forehead and an abrasion on the right side of her neck. He also stated Gillentine complained of neck soreness, headache, and dizziness. He prescribed a pain killer.
 
 
 26
 In 1989, Young and Gillentine filed the present action alleging violations of their civil rights as enforced by 42 U.S.C. Sec. 1983 and state law claims for assault and battery, false arrest and false imprisonment in the Federal District Court for the Southern District of Ohio. Defendants included the City of Dayton, the City of Dayton Police Department, Chief of Police Newby, Officers Vanzant, August, Bryant, and Sergeant Halloran.
 
 
 27
 In October 1990, Defendants filed a motion for summary judgment on all Plaintiffs' Section 1983 claims and on the claims for punitive damages. The district court granted partial summary judgment on the claims, and granted summary judgment on all claims in favor of the following defendants: the City of Dayton, the Dayton Police Department and Chief Newby. On May 22, 1992, upon consent of the parties, the district court referred the case to a Magistrate Judge for trial.
 
 
 28
 In June 1992, the following claims remained and proceeded to trial: (1) Gillentine's Section 1983 claim and state law claim against Vanzant, August, and Halloran alleging false arrest and false imprisonment; (2) Gillentine's Section 1983 claim alleging use of excessive force and her state law claim alleging assault and battery against Vanzant, August, Bryant and Halloran; and (3) Young's Section 1983 claim alleging excessive force and her state claim alleging assault and battery against Vanzant, August, Bryant, and Halloran.
 
 
 29
 Before trial, Defendants filed a motion in limine seeking to exclude the testimony of Plaintiffs' witness Osborne arguing Plaintiffs' counsel failed to arrange depositions. At the final pre-trial conference, the trial court found Plaintiffs' counsel had provided Defendants with Osborne's best available address and examined Osborne to determine whether he had evaded service.
 
 
 30
 After the Magistrate Judge voir dired Osborne, he concluded Osborne would not be permitted to testify. The court, however, granted Plaintiffs' request to proffer Osborne's testimony and directed such proffer be taken subject to cross-examination. During the proffer, Defendants declined cross-examination. The trial court summarized Osborne's testimony as follows:
 
 
 31
 Osborne essentially testified that he had seen Plaintiffs at the nightclub the evening in question, that Young had told him she wasn't feeling well, put her head on his shoulder, and then fell to the floor. Osborne also testified that he helped Young to her feet and escorted her outside. Osborne testified that he did not observe any kind of injury to her body after that episode.
 
 
 32
 JA at 59.
 
 
 33
 The next day, the Magistrate Judge reversed his previous decision and over Defendants' objection read Osborne's proffer to the jury. While deliberating, the jury requested to see or review Osborne's testimony. The trial court denied the request.
 
 
 34
 At the conclusion of Plaintiffs' case in chief, Defendants filed a motion for judgment as a matter of law. The court granted judgment as a matter of law on Gillentine's Section 1983 claim alleging excessive force during arrest. After both parties rested, the Defendants renewed their motion and the court submitted the remaining claims to the jury.
 
 
 35
 The jury found against Gillentine on her Section 1983 and state law claims alleging false arrest and false imprisonment, but found for her on her state law claim of assault and battery. The jury awarded Gillentine zero damages on this claim.
 
 
 36
 The jury found for Young on her Section 1983 claim of excessive force and her state law claims of assault and battery and awarded $155,000 compensatory damages against Officers Vanzant, August, Halloran and Bryant. The jury further awarded $40,000 in punitive damages against Vanzant.
 
 
 37
 Defendants moved for judgment after trial, new trial, or remittitur. On November 4, 1992, the trial court denied Defendants' motions. This timely appeal followed.
 
 II. Discussion
 
 38
 On direct appeal, Defendants argue the district court erred by denying their:
 
 
 39
 1.) motion for new trial based on the erroneous admission of Osborne's proffered testimony;
 
 
 40
 2.) renewed motion for judgment as a matter of law and motion for new trial where the evidence was insufficient to support a verdict, and the jury's verdict was against the manifest weight of the evidence; and
 
 
 41
 3.) motion for new trial or, in the alternative, for remittitur where the damage award clearly exceeded the bounds of reasonable recovery.
 
 
 42
 On cross-appeal, Plaintiff Gillentine argues the district court erred by:
 
 
 43
 1.) refusing to order the jury to resume deliberations where the jury awarded zero damages; and
 
 
 44
 2.) denying her motion for new trial as to damages only where the award of zero dollars was unreasonable.
 
 
 45
 We discuss each allegation of error below.
 
 A. Direct Appeal
 
 46
 1. The Trial Court Did Not Err by Admitting the Proffer
 
 
 47
 The Sixth Amendment right to confrontation does not extend to civil actions. Thus, the issue before the trial judge was whether the probative value of the proffer outweighed any prejudice from its admission. We repose considerable discretion in the trial court in applying this balancing test. Absent a clear abuse of discretion, we must find no error occurred. See Conklin v. Lovely, 834 F.2d 543, 551 (6th Cir.1987).
 
 
 48
 Defendants argue the district court abused its discretion by reading Osborne's proffered testimony to the jury where Defendants had no opportunity to depose or cross-examine him. They seek a new trial alleging Osborne's testimony was crucial and its admittance was prejudicial. Defendants note that the jury's request during deliberations to rehear the proffer establishes such prejudice. The Magistrate Judge found Defendants waived their right to cross-examination and that Defendants suffered no prejudice from the admission of the testimony. The Magistrate Judge further found any error was harmless because Osborne's testimony was cumulative.[1]
 
 
 49
 Defendants argue they did not waive their right to cross-examination because they believed the proffer was solely for purposes of appeal. Although we agree that Defendants did not waive cross-examination, the trial court did not abuse its discretion by admitting the proffer. Moreover, had the trial judge erred by admitting the proffer, we have held that no error in the admission or exclusion of evidence is grounds for granting a motion for new trial unless such action was inconsistent with substantial justice. See McGowan v. Cooper Indus., Inc., 863 F.2d 1266 (6th Cir.1988). Here, the admission was not inconsistent with substantial justice because Defendants suffered no prejudice from the reading of Osborne's testimony.
 
 
 50
 Concerned about fairness to Plaintiffs, who wanted Osborne's live testimony, and to Defendants, who sought to exclude Osborne's testimony, the court decided to read the proffer. Defendants now argue Osborne's testimony was crucial because he was the only witness to Young's fall. The record reveals, however, that his testimony was cumulative and inconsistent.
 
 
 51
 Osborne's testimony corroborated Young's admission that she fell at the 1470 nightclub. Arguably, this corroboration helps Defendants who sought to establish the certainty of her fall. Osborne's testimony that Young suffered no injury, however, contradicted testimony from Young, Gillentine, and other of Plaintiffs' witnesses who testified that Young's chin and teeth were damaged when she returned from the club--before her altercation with the police. The testimony was not prejudicial to Defendants. Moreover, regardless of their request to re-hear this testimony, the jury did not need Osborne's testimony to return a verdict for Young and no prejudice occurred.
 
 
 52
 2. Motions for Judgment as a Matter of Law and New Trial
 
 
 53
 a. The trial court properly denied Defendants' motion for
 
 
 54
 judgment as a matter of law
 
 
 55
 The standard for granting a Rule 50(b) Renewed Motion for Judgment as a Matter of Law is the same as the standard for granting a Motion for Judgment Notwithstanding the verdict (JNOV). See Fed.R.Civ.P. 50 advisory committee's notes on 1991 Amendment. We have articulated the well settled requirements and standards for a district court considering a Rule 50(b) motion and an appellate court in reviewing the decision stating:
 
 
 56
 The issue raised by a motion for a judgment notwithstanding the verdict is whether there is sufficient evidence to raise a question of fact for the jury. In determining whether the evidence is sufficient, the trial court may neither weigh the evidence, pass on the credibility of witnesses, nor substitute its judgment for that of the jury. Rather the evidence must be viewed in the light most favorable to the party against whom the motion is made, drawing from that evidence all reasonable inferences in his favor. If, after thus viewing the evidence, the trial court is of the opinion that it points so strongly in favor of the movant that reasonable minds could not come to a different conclusion, then the motion should be granted. An appellate court when reviewing the trial court's decision is bound by the same standard.
 
 
 57
 Ratliff v. Wellington Exempted Village Schools Bd. of Educ., 820 F.2d 792, 795 (6th Cir.1987) (citations omitted). Our review is de novo. See Cline v. United States, 997 F.2d 191, 196 (6th Cir.1993).
 
 
 58
 Defendants first argue that Plaintiffs offered no competent medical testimony to establish that Young's injuries were proximately caused by her altercation with the police. The hypothetical posed by Plaintiffs' counsel to Dr. Snyder did not include the fact that Young had fallen on her chin before her altercation with the police. According to Defendants, this omission rendered Dr. Snyder's testimony incompetent. Defendants also allege that Young did not tell Dr. Snyder about the earlier injury to her chin and this omission infected his opinion about the proximate cause of her injuries. According to Defendants, because Plaintiffs failed to prove causation, this issue should not have been submitted to the jury.
 
 
 59
 The trial court found Dr. Snyder's testimony sufficient to establish proximate cause.[2] Concluding the evidence was sufficient to go to the jury, the trial court held:
 
 
 60
 Dr. Snyder testified that the injuries he observed and documented with respect to Young were consistent with her fall at the nightclub and with the incident with the police as Young related it. Dr. Snyder testified on cross-examination, inter alia, that Young's injuries were consistent with an impact to one's chin with a blunt object, whether it was a flashlight, the street, a cruiser, a fist, or anything that impacted under the chin. The jury chose to believe that Young's injuries were caused by the altercation with the police.
 
 
 61
 JA at 54 (emphasis in original). Thus, the trial court found that although Dr. Snyder answered a hypothetical question which omitted the fact that Young fell on her chin before the incident with the police, his testimony as a whole was sufficient. We agree.
 
 
 62
 Because Dr. Snyder was the only witness who testified on causation, his testimony must establish a sufficient question of proximate cause to submit to the jury. While the omission of the critical fact of Young's earlier fall rendered the hypothetical question erroneous, this error was harmless. Viewing Dr. Snyder's testimony as a whole, causation was properly submitted to the jury. Additionally, the hypothetical question included facts about Young's ability to talk or scream before her altercation with the police which, combined with Dr. Snyder's testimony as a whole, established a sufficient question of causation.
 
 
 63
 Undisputed testimony from Young, Gillentine, Berge and Voise indicated that prior to Young's altercation with the police--but after her fall at the club--Young had no difficulty speaking. Additionally, Officers Bryant and Vanzant testified that before Vanzant allegedly smashed her face, Young was screaming and yelling at them to leave Gillentine alone. According to the officers Young repeatedly screamed "leave her alone, she hasn't done anything," and "you're hurting her." JA at 568 and 741.
 
 
 64
 Dr. Snyder examined Young after her altercation with the police. He testified that Young suffered from a malocclusion of the jaw--meaning her teeth no longer came together correctly because they were off by about 1/2 inch. JA at 614. According to Dr. Snyder, when Young was admitted she could not talk very well and had to talk through clenched teeth. Moreover, Dr. Snyder testified that Young could not have screamed, or opened her mouth wide enough to scream, with the jaw injury she received.
 
 
 65
 The testimony establishing that Young's ability to scream before her altercation with the officers and her subsequent inability even to speak properly is uncontradicted. This unchallenged testimony viewed with Dr. Snyder's testimony as a whole sufficiently establishes causation.
 
 
 66
 Drawing all inferences in favor of the non-moving party, the evidence does not point so strongly in favor of the movant that reasonable minds could not differ. The jury chose to believe it was the impact between Young's face and the police cruiser which caused her injury and we will not disturb this finding. The Magistrate Judge properly denied the motion.
 
 
 67
 b. The trial court properly denied Defendants' motion for new trial
 
 
 68
 We will not reverse a trial court's denial of a motion for new trial unless a clear abuse of discretion occurred. United States v. O'Dell, 805 F.2d 637, 640 (6th Cir.1986), cert. denied, 484 U.S. 959 (1987).
 
 
 69
 Defendants argue the trial court abused its discretion by denying their motion for new trial where the verdict was against the manifest weight of the evidence. Defendants contend that the admission of the proffer, the lack of competent medical testimony, and the overwhelming evidence in their favor require a new trial. In support of their argument, Defendants re-assert that Dr. Snyder's testimony was "fatally flawed" and that no reasonable jury could have disregarded the testimony refuting Young's recitation of the events.
 
 
 70
 Here, the trial court found that Young and Gillentine's version of the facts supported each element of the claims on which Young was successful. Notably, the Magistrate Judge stated that "[e]ven assuming that Young's and Gillentine's testimony was the only testimony which supports the jury's verdict as to Young's claims, that would not be surprising in light of the nature of the incident which gave rise to this lawsuit." JA at 54.
 
 
 71
 We have scrutinized the trial transcripts and the jury's verdict is not against the manifest weight of the evidence. Although Defendants claim they presented evidence which directly refuted Young's claims, they merely introduced inconsistencies. At best, the "independent" witness testimony presented by Defendants detracted from the weight of the Plaintiffs' evidence. We have already found that the court did not err by admitting Osborne's testimony, that Dr. Snyder's testimony was competent, and that the issue of causation properly went to the jury. Because the verdict is not inconsistent with the evidence presented, no abuse of discretion occurred.
 
 
 72
 3. Motion for New Trial or Remittitur Based on the Jury's Damage Award
 
 
 73
 We review a district court's determination that evidence supported a jury award for an abuse of discretion. Agristor Leasing v. A.O. Smith Harvestore Prod., Inc., 869 F.2d 264, 268 (6th Cir.1989). Where a jury grants a particular damage award and the district court refuses to disturb that finding, an appellate court should be certain indeed that the award is contrary to all reason before it orders a remittitur or a new trial. See Manning v. Altec, Inc., 488 F.2d 127, 133 (6th Cir.1973). A motion for remittitur should be granted only if the award clearly exceeds " 'the amount which, under the evidence in the case, was the maximum that the jury reasonably could find to be compensatory' " for the plaintiff's loss. Id. at 132 (quoting Gorsalitz v. Olin Matheson Chem. Corp., 456 F.2d 180, 181 (5th Cir.), cert. denied, 407 U.S. 921, reh'g denied, 409 U.S. 899 (1972)).
 
 
 74
 Defendants argue the Magistrate Judge erred by failing to grant their motion for new trial or remittitur where the jury's award was "clearly excessive and not based upon any rational estimate of what the damages were, because Plaintiff Young did not set forth any adequate evidence as to damages." Defendants argue Young presented no incurred medical bills, no evidence of future treatment needs, no sum certain as to lost wages, and no evidence of emotional damages.
 
 
 75
 Congress intended that Section 1983 damages compensate persons injured by the deprivation of their constitutional rights if such damages flow from actual injury to the Plaintiff and are not based on the abstract value of constitutional rights allegedly violated. Memphis Community School Dist. v. Stachura, 477 U.S. 299 (1986). A Section 1983 Plaintiff can also recover damages for mental anguish, suffering, impairment of reputation, and out of pocket losses. See Pembaur v. City of Cincinnati, 475 U.S. 469 (1986).
 
 
 76
 Here, Young testified that her altercation with the police resulted in several injuries. First, Young's chin injury required suturing by a plastic surgeon. Because she suffered a fracture of her jaw, Young had her jaw wired shut for approximately seven weeks. Additionally, Young testified she received bruises and scratches on her arms and face.
 
 
 77
 Young presented evidence that she was unable to work for 9 weeks due to her injuries and that as a beautician she earned between $150-$300 per week and between $40-$100 per week in tips. Young also testified that since the incident she no longer goes outside at night alone, that she is afraid of being alone, and that she generally stays home. She indicated her medication interfered with her sleep and that she often had nightmares. Additionally, Young continues to have a great fear of the police. Defendants presented no evidence to rebut Young's testimony about her physical and emotional injuries.
 
 
 78
 The Magistrate judge found the jury's $155,000 award of compensatory damages was reasonable stating:
 
 
 79
 The jury clearly determined that the physical and emotional injuries which she sustained, some of which continued at least up until the time of trial, were caused by the deprivation of her constitutional right to be free from the use of excessive force in effecting her arrest as well as by the assault and battery committed on her. As noted above, there was ample evidence to support the jury's conclusion on those issues. In view of the seriousness of Young's physical and emotional injuries, the pain and suffering she experienced, and continued to experience at least up until the time of trial (some 3 years after the incident), this Court cannot say that the jury's verdict awarding Young $155,000 is excessive.
 
 
 80
 JA at 58. We agree.
 
 
 81
 We are reluctant to "foil the jury's attempt to mete out justice as long as there exists some possible rationale for their verdict." Lewis v. Sears, Roebuck & Co., 845 F.2d 624, 635 (6th Cir.1988). Here, the amount awarded does not clearly exceed the maximum amount the jury reasonably could find to be compensatory, nor does it shock the conscience of this court. The trial court did not abuse its discretion by denying the motions for new trial or remittitur.
 
 
 82
 B. Cross Appeal: The Jury's Award of Zero Damages to Gillentine was Reasonable
 
 
 83
 The same standards govern the right of a court to set aside a verdict for inadequacy as when a verdict is attacked for excessiveness. DeFoe v. Duhl, 286 F.2d 205, 207 (4th Cir.1961) (citations omitted). We, therefore, review the trial court's decision for an abuse of discretion. See Agristor, 869 F.2d at 268.
 
 
 84
 On cross appeal, Gillentine first argues the trial court erred by failing to order the jury to resume deliberations after they awarded her zero dollars. She next alleges the district court erred by denying her motion for new trial on damages because the jury's award was against the manifest weight of the evidence and was unreasonable. Gillentine argues because the jury found Defendants liable for assault and battery, her injuries were undisputed and the jury was required to award damages. We disagree.
 
 
 85
 Because the Magistrate judge granted judgment as a matter of law in favor of Defendants on Gillentine's Section 1983 claim, her damages must flow from her state law cause of action alleging assault and battery. Thus, we first must determine whether under Ohio law a jury may properly award zero damages where liability is established. If so, the trial court did not err by refusing to require further deliberations.
 
 
 86
 The Magistrate Judge looked to Ohio law and found that "[b]y marking the verdict form "0", the jury, in effect, found that either there was no injury or that no injury was caused by the assault and battery." JA at 61. (emphasis in original). We agree. In Ohio, a jury properly may find in favor of the plaintiff and assess zero damages due from the defendant. See Muckus v. Ruggles, 138 N.E.2d 389, 390 (Ohio 1956) (finding that a jury's decision that defendant committed assault and battery, but that plaintiff suffered neither compensatory nor punitive damages, did not nullify the jury's verdict); see also Reder v. Antenucci, 574 N.E.2d 1137, 1140 (Ohio Ct.App.1989) (holding jury's award of zero dollars was reasonable because "the jury either found that there was no injury or that no injury was caused by the accident.") Thus, the trial court properly did not require any further deliberations. We next must determine whether zero damages was reasonable.
 
 
 87
 Here, Gillentine testified that her altercation with the police resulted certain physical and mental ailments but she introduced no evidence regarding monetary losses or damages from inability to work. Based on the evidence presented, it was reasonable for the jury to find Gillentine suffered no injury or that no compensable injury was caused by the officers. It was well within the jury's province to discredit Gillentine's testimony about her injuries and the trial court did not abuse its discretion by upholding the award.
 
 III. Conclusion
 
 88
 For the reasons stated above, we AFFIRM the judgments and damage awards imposed by the Honorable Michael R. Merz, United States Magistrate Judge for the Southern District of Ohio.
 
 
 89
 WELLFORD, Senior Circuit Judge, concurring in part and dissenting in part:
 
 
 90
 I concur with the majority in respect to the issues pertaining to plaintiff Terri Gillentine in most respects. I differ only with respect to liability of certain defendants for assault and battery. (This may be academic, however, since the jury awarded no damages in this regard and we unanimously affirm that result.)
 
 
 91
 Gillentine testified that she and Debra Young, on the way to a nearby hospital for treatment for Young's recent injury at a bar or dance club, encountered a nude rape victim who claimed the rape episode occurred at a nearby complex. Apparently someone called the Dayton police to investigate. The investigating police--Officer Vanzant specifically--, on arrival, called out to plaintiff for information, reasonably believing that one of them might be the rape victim, or might have knowledge at this early morning hour of the alleged criminal conduct in this particular area. Gillentine responded with an obscenity, claiming later that she did not know that it was the police who were in contact with her. She claimed that subsequently she was "yanked" by the arm and thrown to the ground and handcuffed.
 
 
 92
 Officer Vanzant, who was the training officer to his partner, Officer August, testified that plaintiffs appeared to be supporting each other as they walked when he approached them with a flashlight to investigate the reported rape. The officers allegedly identified themselves as police officers, and Vanzant asked plaintiffs to stop. Upon being told plaintiffs were looking for the hospital entrance and feeling that Young appeared to need assistance, Vanzant offered assistance and reached to take Young's arms, whereupon he testified that Gillentine punched him in the face. There is conflict as to whether Vanzant may also have taken hold of Gillentine's arm at the time of their altercation. Both Gillentine and Vanzant agree that very shortly thereafter, Gillentine fell or was wrestled to the ground while struggling to avoid being handcuffed.[1]
 
 
 93
 Vanzant then placed Gillentine under arrest and placed her in the police cruiser. Gillentine said she saw Officer August with his arms around Young during the encounter. She saw another officer come to the scene after her encounter. She claimed that she said Vanzant "hit [Young's] head against the [police] car." Gillentine was vaguely aware of Officer Bryant's presence; she said neither August nor Bryant interfered with Vanzant, and she heard them say nothing. Young testified that only Vanzant used force against Gillentine and that he alone "slammed" her into the police car. Other unidentified officers, Young said, arrived later and Sergeant Halloran identified himself to her in the police cruiser and inquired about the rape victim. Young said that she reported to Halloran what had happened, and that she had been "abused by Officer Vanzant."
 
 
 94
 Neither plaintiff testified as to any undue force used by any officer except Vanzant. The magistrate judge held that no defendant used excessive force in effecting the arrest. I would hold that all defendants, except Vanzant, are entitled on the record to judgment on Gillentine's assault charges.
 
 
 95
 As to plaintiff Young, I would dissent from the judgments for damages. In the case of all other defendants, except Vanzant, there is no evidence of their inflicting any injury to Young. August held Young in a bear hug briefly, but did not hurt her, in preventing her from joining the encounter between Gillentine and Vanzant. Neither Bryant nor Halloran participated in an assault or use of undue force against Young.
 
 
 96
 I disagree with regard to the erroneous handling by the magistrate judge of Michael Osborne's testimony. I would conclude that the error, however, was harmless under all the circumstances, had this been the only serious problem in the case.
 
 
 97
 The clear weight of the independent testimony in this case--the hospital witnesses who observed the encounter, or a tape of the encounter, and the admitting nurse gave testimony favorable to the defendants. None saw any undue force or assault against plaintiffs. Although Dr. Jeffrey Snyder felt that Young suffered a contusion and a fracture of the mandible as a result of the police encounter, he conceded that had she reported to him her cut and injury to the mouth, teeth, chin (and possibly her face) before the police encounter, it would have made a "significant difference" in his opinion. Medical records reflected a "questionable left mandibular fracture." A dental consultant did not confirm this condition diagnosed by Dr. Snyder. Plaintiff's evidence failed as a matter of expert medical opinion evidence as to causation, because she herself and all her witnesses conceded that she injured herself by falling at the club or bar before she came into contact with the police. She was having so much trouble with this injury that about 1:30 a.m., she felt she needed emergency hospital care. She had broken her teeth in the earlier fall. I disagree with plaintiff's contention that she needed no expert medical opinion in this case to establish that the police action, rather than her earlier fall, caused her jaw injury (which was her most serious claim). See Darnell v. Eastman, 23 Ohio St.2d 13, 261 N.E.2d 114, 116 (1970) (holding that "[e]xcept as to questions of cause and effect which are so apparent as to be matters of common knowledge, the issue of causal connection between an injury and a specific subsequent physical disability involves a scientific inquiry and must be established by the opinion of medical witnesses competent to express such opinion").
 
 
 98
 Both plaintiffs admittedly refused to cooperate with police investigating a serious crime. I am satisfied from examining the entire record that the jury verdicts for Young were flawed for the reasons stated. I would grant plaintiff Young the opportunity for a new trial against Vanzant only, but I dissent from affirming the verdicts in her favor.
 
 
 
 [1]
 Within its decision and order, the trial judge made the following findings regarding the admission Osborne's proffer:
 On the second morning of trial, after reviewing Osborne's proffered testimony, I reversed my prior decision [not permitting Osborne to testify because he ignored subpoenas] and, over Defendants' objection, permitted Osborne's proffered testimony to be read to the jury.
 * * *
 As noted above, I specifically stated that the proffer of Osborne's testimony would be taken subject to cross-examination. Defendants' counsel was given the opportunity to cross-examine Osborne during the proffer of his testimony but declined to do so. Osborne was clearly available for such cross-examination and Defendants' counsel waived any such examination. The basis on which Defendants had sought to exclude Osborne's testimony in the first instance was that they had not had an opportunity to depose him; offered essentially that opportunity in the midst of trial, they declined to use it.
 Assuming arguendo that it was error for Osborne's testimony to be read to the jury, it was not prejudicial to the Defendants. As noted by the Defendants, Osborne essentially corroborated Young's testimony that she had fallen at the nightclub. Osborne's testimony with respect to his not noting any injuries to Young following her fall at the nightclub contradicted Young's own testimony that she injured her chin and damaged her teeth as a result of the fall. Further, even without Osborne's testimony, there was sufficient evidence from other witnesses for the jury to find in favor of Young.
 ... This Court cannot, and will not, even begin to speculate about the numerous reasons the jury may have had for requesting to see or review Osborne's testimony during deliberations. However, the fact that the jury made such request does not give rise to a presumption that the admission of his testimony was prejudicial--to Defendants or Young.
 JA at 58-60.
 
 
 [2]
 The court first noted it was questionable whether expert medical testimony was necessary because "[i]t would certainly be within the knowledge of laymen that if one's head and face are forcibly pushed into a solid, immovable object, serious head and facial injuries will result." JA at 54
 
 
 [1]
 Young testified that a police officer "yanked [Gillentine] away from me ... and [she was] thrown on the ground." Young also testified that she "was grabbed in the bear hug." When Gillentine was handcuffed, both plaintiffs said they knew defendants were police officers